# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *Lucas v. County of Cook*, 2013 IL App (1st) 113052

---

| | |
|---|---|
| Appellate Court Caption | DOROTHY J. LUCAS, Plaintiff-Appellant, v. THE COUNTY OF COOK, Defendant-Appellee. |
| District & No. | First District, Second Division <br> Docket No. 1-11-3052 |
| Filed | March 5, 2013 |
| Held <br> (*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Summary judgment was properly entered for defendant county in plaintiff's action alleging a violation of the Whistleblower Act and retaliatory discharge, since she did not establish that, with her training, the county's request that she treat male patients with sexually transmitted diseases as part of her employment with the county's health department would violate any rule or regulation, and no violation of a clearly mandated public policy was set forth in support of the retaliatory discharge count. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 09-L-11982; the Hon. Raymond Mitchell, Judge, presiding. |
| Judgment | Affirmed. |

| Counsel on Appeal | Law Office of Denise M. Mercherson, of Chicago (Denise M. Mercherson, of counsel), for appellant. |
|---|---|
| | Anita M. Alvarez, State's Attorney, of Chicago (Patrick T. Driscoll, Jr., Gregory Vaci, and Andrew J. Creighton, Assistant State's Attorneys, of counsel), for appellee. |
| Panel | PRESIDING JUSTICE HARRIS delivered the judgment of the court, with opinion. |
| | Justices Quinn and Simon concurred in the judgment and opinion. |

## OPINION

¶ 1    Plaintiff, Dorothy J. Lucas, M.D., filed a two-count amended complaint against defendant, County of Cook (Cook County). Cook County terminated Dr. Lucas from the Cook County department of public health (CCDPH)[1] after she refused to treat male patients or to attend training to treat male patients that had sexually transmitted diseases (STD). Count I of her complaint alleged that Cook County violated section 20 of the Illinois Whistleblower Act (Act) (740 ILCS 174/20 (West 2010)), while count II of her complaint contained a claim for common law retaliatory discharge.[2] Under both counts of her complaint, Dr. Lucas alleged that Cook County terminated her for reporting violations of title 68, section 1285.240, of the Illinois Administrative Code[3] (Administrative Code) (68 Ill. Adm. Code 1285.240 (2005)) to "the Illinois Office of Professional Regulations." Cook County filed a motion for summary judgment pursuant to section 2-1005(c) of the Illinois Code of Civil Procedure (Code) (735 ILCS 5/2-1005(c) (West 2010)), which the circuit court granted as to both counts of Dr. Lucas's complaint. At issue is whether the circuit court

[1]We will refer to defendant generally as "Cook County." Where necessary, we will refer to the more specific subsection of Cook County, the CCDPH.

[2]Dr. Lucas titled count II of her amended complaint as "Common Law–Whistleblower." In pleadings before the circuit court and in her briefs before this court, she refers to the count as a retaliatory discharge claim even though her complaint does not use the term "retaliatory discharge." Based on the pleadings and the briefs, and the substance of Dr. Lucas's allegations, we will refer to count II of her complaint as a common law claim for retaliatory discharge.

[3]In her complaint, Dr. Lucas refers to title 68, section 1285.240, of the Administrative Code as the "Medical Practices Act of 1987, Section 1285.240." Based on our review of the record, and the fact that the Medical Practices Act of 1987 does not have a section titled "1285.240," we assume Dr. Lucas meant title 68, section 1285.240, of the Administrative Code.

properly entered summary judgment in favor of Cook County. We hold that the circuit court properly entered summary judgment in Cook County's favor on count I of Dr. Lucas's amended complaint because Dr. Lucas failed to establish that the activity Cook County wanted her to engage in, *i.e.*, the treating of male patients or to attend training to treat male patients, violated any rule, law or regulation. The circuit court properly entered summary judgment in Cook County's favor on count II of Dr. Lucas's amended complaint because Dr. Lucas failed to articulate a clearly mandated public policy to support her claim of retaliatory discharge.

¶ 2                                    JURISDICTION

¶ 3    On July 27, 2011, the circuit court granted Cook County's motion for summary judgment. On October 3, 2011, the circuit court denied Dr. Lucas's motion for reconsideration. On October 17, 2011, Dr. Lucas timely filed her notice of appeal. On October 31, 2011, Dr. Lucas filed an amended notice of appeal. Accordingly, this court has jurisdiction pursuant to Illinois Supreme Court Rules 301 and 303 governing appeals from final judgments entered below. Ill. S. Ct. R. 301 (eff. Feb. 1, 1994); R. 303 (eff. May 30, 2008).

¶ 4                                    BACKGROUND

¶ 5    Dr. Lucas, a board-certified obstetrician and gynecologist, filed a two-count amended complaint against Cook County alleging that it retaliated against her for her reporting "the violation of state or federal law, rule or regulations by the [CCDPH]." Dr. Lucas began working for Cook County as the assistant medical director of the CCDPH and medical director of family planning and noncommunicable disease in September of 2001. In December of 2001, she was appointed as the medical director of the CCDPH, a position she held concurrently with her position as medical director of family planning and noncommunicable disease. In 2006, she "was demoted to the position of Medical Director in Family Planning and then to Clinic Physician."

¶ 6    According to Dr. Lucas, on August 24, 2008, CCDPH told her "that unless she agreed[ ] to provide [STD] services to male clients and to complete training for male clients by October 31, 2008, she could face disciplinary action up to and including termination." Dr. Lucas alleged she performed her four-year residency in obstetrics and gynecology without male patient contact. She notified CCDPH "that 10 days of training at the County's Core Center would not qualify an obstetrician and gynecologist to examine or treat male or female patients for STD medical services." Dr. Lucas alleged further that CCDPH wanted her to work in the "Core Clinic," which she explained was a "specialty clinic for patients who are HIV positive, impacted with AIDS and other STD's." Dr. Lucas asserted that 10 days of training would be inadequate preparation for her to treat patients of different ages and sexes, and that this could result in substandard medical care and malpractice in the Core Clinic.

¶ 7    On September 4, 2008, Dr. Lucas notified CCDPH that she objected to treating male patients with only 10 days of training and that CCDPH "was exposing her to potential litigation for medical malpractice due to a demand that she practice outside her training and

the usual and customary practice of medicine for an OB/GYN." On that same day, Dr. Lucas notified the "Illinois Office of Professional Regulations" that CCDPH "was in violation of the Medical Practices Act of 1987, section 1285.240 by requiring her to perform services as a physician without adequate training" and for offering her inadequate training. Dr. Lucas did not attend the 10-day training for treating males with STDs, which was held on October 30, 2008. CCDPH terminated Dr. Lucas on November 7, 2008.

¶ 8    Count I of Dr. Lucas's complaint alleged Cook County violated section 20 of the Act. 740 ILCS 174/20 (West 2010). Specifically, Dr. Lucas alleged Cook County took adverse action against her for reporting Cook County's "failure to comply with the Medical Practice Act of 1987, section 1285.240 and related rules or regulations." In count II of her complaint, Dr. Lucas made a claim of common law retaliatory discharge. Specifically, she alleged that her "employment ended on November 7, 2008 in retaliation for her engagement in protected activity by reporting violations of the Medical Practice Act of 1987, section 1285.240." She further alleged that her "discharge for reporting medical practice, safety, and health violations to the office of Professional Regulations is against clear mandated public policy which protects the health and safety of the citizens of Illinois." Dr. Lucas sought a declaratory judgment against Cook County for its violation of the Act. She also sought reinstatement to her position as a clinician physician, and damages, including front and back pay, future earnings, and an award of lost employee benefits. Additionally, she sought payment of her fees, costs, and prejudgment interest.

¶ 9    Cook County filed a motion for summary judgment pursuant to section 2-1005(c) of the Code. 735 ILCS 5/2-1005(c) (West 2010). Cook County argued that it was entitled to judgment on count I of Dr. Lucas's amended complaint because CCDPH never asked Dr. Lucas to participate in any illegal activity. Specifically, the treatment of both male and female patients for STDs did not violate any rule or regulation. Cook County also pointed out that section 20 of the Act did not provide Dr. Lucas with a cause of action against it. Additionally, Cook County asserted that the CCDPH's repeated requests that Dr. Lucas attend training to expand her practice to include treatment of male patients did not violate any law or regulation. Regarding count II of Dr. Lucas's amended complaint, Cook County argued there was no evidence that Dr. Lucas's termination was based on retaliation. Cook County attached numerous documents as exhibits to its motion, which we will address in turn below.

¶ 10    Exhibit A of Cook County's motion contained both an affidavit from Dr. Linda Rae Murray, the chief medical officer at the CCDPH, and a letter Dr. Murray wrote to Dr. Lucas. In her affidavit, Dr. Murray explained that Dr. Lucas provided services to female patients at the family planning clinic at CCDPH. Dr. Murray averred that the "scope of services" of the family planning clinic changed in 2008 by merging with the STD clinic. This was done "so that the physicians and other clinicians could provide care to both female and male patients" and because it "allowed the more efficient use of limited staff resources." One year before the merger occurred, all clinic physicians were notified of the changes. Dr. Lucas repeatedly stated she would not treat male patients as it was outside her area of training. Dr. Murray attested further that "[t]raining in the treatment of male patients for STD was repeatedly offered to Dr. Lucas, but she refused to even attend any such training." Dr. Lucas was the

-4-

only physician to refuse to treat patients of both sexes. Dr. Murray stated that they "explored the idea of allowing Dr. Lucas to continue to treat only female patients, but it required the scheduling of two practitioners at a time, which did not allow for a full integration of the new service model." Dr. Murray attested that there is "[n]othing in the Medical Practices Act, the relevant Illinois Administrative Code, or other public policy that prohibits a physician from treating" patients of both sexes. Dr. Murray additionally stated that the physical examination is the only different aspect of treating male patients. On November 7, 2008, Dr. Lucas was terminated "[a]fter given a final opportunity and again refusing to be trained in the treatment of male patients." Dr. Murray attested that Dr. Lucas's termination was not made in retaliation and that "[t]he sole reason for Dr. Lucas' termination was that she could not provide medical services to both male and female patients as required by the Family Planning and STD clinic merger." The letter Dr. Murray wrote to Dr. Lucas, dated September 22, 2008, informed Dr. Lucas that she had to "complete the training *** on or before Friday, October 31, 2008." The letter informed Dr. Lucas, "[i]f you elect not to change your scope of practice you will have the sincere thanks of the Department for your years of service. Your last day of work will be Friday, November 7, 2008."

¶ 11    Exhibit B contained an affidavit from Helen Hayes, who served as special counsel for CCDPH in 2008, and a letter Hayes sent to Dr. Lucas. In her affidavit, Hayes attested that the family planning and STD clinics merged to allow "more efficient use of limited staff resources and was designed to be more convenient for clients, in that it allowed sexual partners to be seen during the same clinic session and to receive both Family Planning and STD services." Hayes reiterated that Dr. Lucas informed her supervisors that she would refuse to treat male patients and that she repeatedly refused to attend any of the training being offered. Hayes met with Dr. Lucas on November 6, 2008, whereupon Dr. Lucas "indicated that under no circumstances would she expand her scope of services to include male patients." The letter contained in Exhibit B was from Hayes to Dr. Lucas, and was dated February 20, 2009. The letter explained to Dr. Lucas the circumstances that led to her termination.

¶ 12    Exhibit C contained a discovery deposition of Dr. Lucas, and several letters and emails referred to in the deposition. In her deposition, Dr. Lucas was shown a letter she sent to "Dr. Martin" and "Mr. Barnes" dated April 6, 2007, in which she refers to a meeting with Dr. Murray on the merger of the family planning and the STD clinics. Dr. Lucas stated that she had not been trained to treat male patients. She also was shown a letter addressed to her from Dr. Williams, the clinical supervisor for STD and family planning clinics, dated August 29, 2008. In the letter, Dr. Williams reiterated to Dr. Lucas that the STD and family planning clinics would merge "by year-end" and that training was being offered for "clinicians who have not done STD clinic work." Dr. Williams explained that "[a]t the most recent federal audit of the Title X contract affecting Family Planning Clinics we were informed that we must offer family planning to males, as well as females." The letter also referred to Dr. Lucas's refusal to see male patients and informed her that she needed to complete training by October 31, 2008. Dr. Lucas attested that title X is a program that allocates funding for family planning clinics operated by the Department of Health and Human Services. Dr. Lucas was also shown a letter she sent to Dr. Williams, dated September 4, 2008. In that

letter, Dr. Lucas explained that she had only been trained to treat female patients. She did not think that "[a] few weeks of mandatory STD training" was adequate preparation to treat male patients. Dr. Lucas stated in her letter that she would contact and seek counsel from several medical boards because she feared malpractice litigation. During her deposition, Dr. Lucas testified that she communicated with the American Medical Association, the American Board of Medical Specialists, American Board of Obstetricians and Gynecologists, the American College of Obstetrics and Gynecology, the Office of Professional Regulation, and the Chicago Medical Society. She did not have a copy of the letters she sent to the various boards during her deposition, but stated she would be willing to produce them. She could recall that a representative of "ISMIE" told her to get an attorney. Dr. Lucas admitted that she did not ever attend any STD training.

¶ 13    During her deposition, Dr. Lucas was also shown a letter she sent to Warran Batts, the chairman of the Cook County health and hospital board, dated October 6, 2008, in which she explained her training and why she believed that 10 days or 2 weeks of STD training was not sufficient to prepare her to treat male patients. After being shown the letter, Dr. Lucas testified that 10 days of training was inappropriate. She also testified that she never treated male patients during the course of her career, except under supervision for six weeks during medical school. When asked whether anyone from the CCDPH ever informed her that her termination was for retaliation for disclosing information in violation of the Medical Practice Act of 1987 (225 ILCS 60/1 et seq. (West 2010)), she answered, "No." She also answered, "No" when asked whether anyone had told her not to disclose any information to a government agency. Dr. Lucas did not have any conversations with anyone regarding what would be adequate training for the treatment of male patients. She did state that the Office of Professional Regulation, the American Medical Association, the American Board and the American College of Medical Specialist mandate that physicians practicing medicine incompetently should be reported. Dr. Lucas opined that six months to a year of training would have been adequate for her to treat male patients.

¶ 14    In response to Cook County's motion for summary judgment, Dr. Lucas argued that she was discharged for complaining to management and reporting unlawful or unethical behavior such that she stated a valid claim of retaliatory discharge. Therefore, Dr. Lucas asserted that her claim raised a genuine issue of material fact precluding summary judgment. Dr. Lucas also asserted that she raised sufficient issues of fact to support her claim under section 20 of the Act. Dr. Lucas attached excerpts from the deposition testimony of Dr. James Arthur Threatte to her response.[4] Dr. Threatte testified he is a board-certified obstetrician and gynecologist whose practice is limited to treating female patients.[5] He has known Dr. Lucas

---

[4]Dr. Lucas also attached to her response documents that Cook County had already attached to its motion, including Dr. Lucas's deposition testimony and correspondence either sent to or by Dr. Lucas.

[5]Dr. Lucas only attached excerpts from Dr. Threatte's deposition. However, Cook County attached the entire transcript from Dr. Threatte's deposition to its reply in support of its motion for summary judgment. The facts recited here are from the full transcript of Dr. Threatte's deposition

for 34 years. They met in medical school while they were both students. Since medical school, they have been friends, but have not had any professional relationship or worked together. He sees Dr. Lucas "infrequently" and was not compensated for his testimony. He agreed that neither the Medical Practices Act nor the Administrative Code prohibits doctors from treating patients of the opposite sex. He has never treated males for STDs, nor has he taught others how to treat STDs. He did, however, opine that 10 days of training for the treatment of male patients with STDs was inadequate. When asked what he believed would be adequate training for treating males with STDs, Dr. Threatte answered that he could only speak for what training he would need to treat males. He then answered that he thought three to six months of a combination of classroom and on-the-job training would be needed. He did not speak to anyone at the CCDPH about what training was being offered to Dr. Lucas.

¶ 15    In reply in support of its motion for summary judgment, Cook County argued that it was entitled to summary judgment because there was no violation of the Act. Specifically, Dr. Lucas did not show any law, rule, or regulation that prohibited a physician from treating patients of the opposite sex. In regard to Dr. Lucas's retaliatory discharge count, Cook County argued Dr. Lucas failed to demonstrate a violation of a public policy and that Dr. Lucas's decision to not treat male patients was her own personal choice which did not create a cause of action for retaliatory discharge. Cook County disputed that there was a genuine issue of fact concerning the adequacy of the training being offered to Dr. Lucas; arguing that it was not the court's role to review an employer's business decisions. Cook County pointed out that there is no rule against requesting an employee to attend training and asserted that Dr. Lucas could not possibly know whether the training being offered to her was adequate because she refused to attend. Cook County asserted that Dr. Threatte was not an expert as he does not treat male patients and has never taught the treatment of STDs. Cook County stressed that Dr. Lucas presented no evidence that CCDPH's decision to consolidate clinics violated any laws nor did she show that her termination was made in retaliation. Cook County attached to its reply a copy of Dr. Lucas's amended complaint and the full transcript of Dr. Threatte's deposition.

¶ 16    The circuit court granted Cook County's motion for summary judgment on both counts of Dr. Lucas's complaint. In its written order, the circuit court noted that for count I of her complaint, Dr. Lucas did not specify which parts of title 68, section 1285.240, of the Administrative Code Cook County allegedly asked her to violate. The circuit court found, however, that Dr. Lucas testified during her deposition "she was asked to violate sections 1, 1A, 1B, 1C, E, 2C, 2E, and F, which she alleges require a doctor to be competent to provide medical care." Accordingly, the circuit court found that the sections cited by Dr. Lucas do not prohibit a physician from treating patients of both sexes. The circuit court further found that Dr. Lucas repeatedly refused to attend the training as requested by Cook County. Dr. Lucas's termination did not violate the Act because "CCDPH's request that Dr. Lucas provide treatments she had previously provided to female patients to males and females after attending training was not a violation of the Medical Practice Act and Administrative Code

---

as opposed to the excerpts attached to Dr. Lucas's response.

§ 1285.240, and because CCDPH did not ask Dr. Lucas to do anything in violation of a law, rule, or regulation."

¶ 17    The circuit court found Cook County was entitled to summary judgment on count II of Dr. Lucas's complaint because Dr. Lucas failed to establish that the reporting of illegal activity caused her termination. The circuit court noted that "[e]ven if being asked to perform care without adequate training violates public policy, Dr. Lucas does not provide evidence that she was terminated for reporting this violation to a governmental agency or supervisor." The circuit court found that the pleadings showed that CCDPH restructured the clinics for efficiency reasons, and that Dr. Lucas knew of the restructuring in April of 2007. Dr. Lucas alleged that she was informed on August 24, 2008, that she would be terminated if she did not complete training. She did not report CCDPH until September 4, 2008, and October 6, 2008, respectively. The circuit court found that "CCDPH informed Dr. Lucas before she reported them that she might be disciplined for failing to complete training."

¶ 18    Dr. Lucas filed a motion to reconsider, which the circuit court denied. Dr. Lucas timely filed her notice of appeal.

¶ 19                                    ANALYSIS

¶ 20    Before this court, Dr. Lucas argues that the sufficiency of the training she was offered is a question of fact precluding summary judgment in this matter. Dr. Lucas argues further that she was terminated in retaliation for reporting violations committed by the CCDPH. She maintains that the competency of medical treatment provided by physicians is a matter of public interest.

¶ 21    Cook County argues before this court that the circuit court correctly entered summary judgment in its favor on count I of Dr. Lucas's complaint because Dr. Lucas was never asked to participate in any illegal activity. Specifically, Cook County asserts that Dr. Lucas has not shown any rule, regulation, law, or public policy that would prohibit a physician from treating patients of both sexes. Therefore, Cook County argues that Dr. Lucas cannot show that section 20 of the Act was violated. Cook County argues that the circuit court properly entered summary judgment on count II of Dr. Lucas's complaint because Dr. Lucas failed to establish a cause of action for retaliatory discharge. Namely, she failed to show a violation of a public policy or establish any proof of retaliation. Cook County maintains that the merging of the family planning clinic and the STD clinics was a medically sound business decision that is a valid and nonpretextual reason for Dr. Lucas's termination.

¶ 22    Initially, we note that before the circuit court, Dr. Lucas argued, under count I of her amended complaint, that Cook County violated section 20 of the Act. 740 ILCS 174/20 (West 2010). However, before this court, she argues that Cook County also violated section 22(A)(5) of the Medical Practice Act of 1987 (225 ILCS 60/22(A)(5) (West 2010)). After reviewing the record, we hold that Dr. Lucas has waived her contention that Cook County violated section 22(A)(5) of the Medical Practices Act of 1987 for failing to raise it in the circuit court. *Haudrich v. Howmedica, Inc.*, 169 Ill. 2d 525, 536 (1996) ("It is well settled that issues not raised in the trial court are deemed waived and may not be raised for the first time on appeal."). Accordingly, under count I of Dr. Lucas's complaint, the only issue properly

before this court is whether Cook County violated section 20 of the Act by asking Dr. Lucas to violate title 68, section 1285.240, of the Administrative Code.

¶ 23    Summary judgment is proper where "the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." 735 ILCS 5/2-1005(c) (West 2010). In ruling on a motion for summary judgment, the circuit court is to determine whether a genuine issue of material fact exists, not try a question of fact. *Williams v. Manchester*, 228 Ill. 2d 404, 417 (2008). A party opposing a motion for summary judgment "must present a factual basis which would arguably entitle him to a judgment." *Allegro Services, Ltd. v. Metropolitan Pier & Exposition Authority*, 172 Ill. 2d 243, 256 (1996). Pleadings are to be liberally construed in favor of the nonmoving party when determining whether a genuine issue of material fact exists. *Williams*, 228 Ill. 2d at 417. Summary judgment in favor of a defendant is proper where the plaintiff fails to establish an element of a cause of action. *Pyne v. Witmer*, 129 Ill. 2d 351, 358 (1989). We review summary judgment rulings *de novo*. *Espinoza v. Elgin, Joliet & Eastern Ry. Co.*, 165 Ill. 2d 107, 113 (1995).

¶ 24                              Count I: Section 20 of the Act

¶ 25    Section 20 of the Act provides, in relevant part, that "[a]n employer may not retaliate against an employee for refusing to participate in an activity that would result in a violation of a State or federal law, rule, or regulation." 740 ILCS 174/20 (West 2010). This court has held that the language of section 20 is unambiguous and that a "plaintiff must actually refuse to participate" in an activity that would violate a law or regulation. *Sardiga v. Northern Trust Co.*, 409 Ill. App. 3d 56, 62 (2011). Additionally, this court has further held that the term " 'refusing' " under section 20 of the Illinois Whistleblower Act "means refusing; it does not mean 'complaining' or 'questioning.' " *Id.*

¶ 26    Dr. Lucas, in her complaint, asserted that she refused to participate in an activity that would violate title 68, section 1285.240, of the Administrative Code. 68 Ill. Adm. Code 1285.240 (2005). Title 68, section 1285.240, provides:

"a) Dishonorable, Unethical or Unprofessional Conduct

1) In determining what constitutes dishonorable, unethical or unprofessional conduct of a character likely to deceive, defraud or harm the public, the Disciplinary Board shall consider whether the questioned activities:

A) Are violative of ethical standards of the profession (such as safeguard patient confidence and records within the constraints of law; respect the rights of patients, colleagues and other health professionals; observe laws under the Act and pertaining to any relevant specialty; to provide service with compassion and respect for human dignity);

B) Constitute a breach of the physician's responsibility to a patient;

C) Resulted in assumption by the physician of responsibility for delivery of patient care that the physician was not properly qualified or competent to render;

D) Resulted in a delegation of responsibility for delivery of patient care to persons who were not properly supervised or who were not competent to assume such responsibility;

E) Caused actual harm to any member of the public; or

F) Are reasonably likely to cause harm to any member of the public in the future.

2) Questionable activities include, but are not limited to:

A) Being convicted of any crime an essential element of which is larceny, embezzlement, obtaining money, property or credit by false pretenses or by means of a confidence game, dishonesty, fraud, misstatement or moral turpitude;

B) Delegating patient care responsibility to any individual when the physician has reason to believe that the person may not be competent;

C) Misrepresenting educational background, training, credentials, competence, or medical staff memberships;

D) Failing to properly supervise subordinate health professional and paraprofessional staff under the licensee's supervision and control in patient care responsibilities; or

E) Committing of any other act or omission that breaches the physicians responsibility to a patient according to accepted medical standards of practice.

b) Immoral Conduct

1) Immoral conduct in the commission of any act related to the licensee's practice means conduct that:

A) Demonstrates moral indifference to the opinions of the good and respectable members of the profession;

B) Is inimical to the public welfare;

C) Abuses the physician/patient relationship by taking unfair advantage of a patient's vulnerability; and

D) Is committed in the course of the practice of medicine.

2) In determining immoral conduct in the commission of any act related to the licensee's practice, the Disciplinary Board shall consider, but not be limited to, the following standards:

A) Taking advantage of a patient's vulnerability by committing an act that violates established codes of professional behavior expected on the part of the physician;

B) Unethical conduct with a patient that results in the patient engaging in unwanted personal, financial or sexual relationships with the physician;

C) Conducting human experimentation or utilizing unproven drugs, medicine, surgery or equipment to treat patients, except as authorized for use in an approved research program pursuant to rules of the Illinois Department of Public Health authorizing research programs (77 Ill. Adm. Code 205.130) or as

otherwise expressly authorized by law;

   D) Committing an act, in the practice of persons licensed under the Act, of a flagrant, glaringly obvious nature, that constitutes conduct of such a distasteful nature that accepted codes of behavior or codes of ethics are breached;

   E) Committing an act in a relationship with a patient so as to violate common standards of decency or propriety; or

   F) Any other behavior that violates established codes of physician behavior or that violates established ethical principles commonly associated with the practice of medicine.

   c) In determining what constitutes gross negligence, the Disciplinary Board shall consider gross negligence to be an act or omission that is evidence of recklessness or carelessness toward or a disregard for the safety or well-being of the patient, and that results in injury to the patient." 68 Ill. Adm. Code 1285.240 (2005).

¶ 27   When reviewing a statute, we must "ascertain and give effect to the legislature's intent." *Andrews v. Kowa Printing Corp.*, 217 Ill. 2d 101, 106 (2005). "The most reliable indicator of such intent is the language of the statute, which is to be given its plain and ordinary meaning." *Solon v. Midwest Medical Records Ass'n*, 236 Ill. 2d 433, 440 (2010). The statutory language's plain and ordinary meaning must be used where such language is clear. *Vancura v. Katris*, 238 Ill. 2d 352, 378 (2010). Our review of a statute is *de novo. Blum v. Koster*, 235 Ill. 2d 21, 29 (2009).

¶ 28   In this case, we hold that the circuit court properly entered summary judgment on count I of Dr. Lucas's amended complaint because Dr. Lucas failed to establish that the activity Cook County wanted her to engage in, *i.e.*, the treating of male patients or to attend training to treat male patients, violated any law, rule or regulation. In her complaint, Dr. Lucas cites title 68, section 1285.240, of the Administrative Code as the law Cook County wanted her to violate. Title 68, section 1285.240, of the Administrative Code does not prohibit Cook County's request to Dr. Lucas to either treat male patients or to attend training to treat male patients. Rather, title 68, section 1285.240, lists standards that the Medical Disciplinary Board considers when disciplining physicians licensed under the Medical Practice Act of 1987. 68 Ill. Adm. Code 1285.240 (2005); 68 Ill. Adm. Code 1285.200 (2005) ("The Medical Disciplinary Board *** shall be responsible for all discipline for physicians licensed under the Medical Practice Act of 1987 ***."). We hold Dr. Lucas's reliance on title 68, section 1285.240, is misplaced because it does not prohibit Cook County's request that Dr. Lucas treat male patients or attend training to treat male patients. Dr. Lucas did not rely on any other authority to show that Cook County asked her to perform an activity that would be illegal.

¶ 29   In her briefs before this court, Dr. Lucas argues that a genuine issue of material fact exists because of her assertion that the training Cook County offered was not adequate. The facts, however, show that Dr. Lucas repeatedly refused to attend training and, therefore, could not know whether the training was adequate or not. She did not attend the training as ordered and then refuse to treat male patients based on her asserted belief that the offered training would

-11-

not qualify her to treat male patients.[6] Dr. Lucas's argument that the amount of training Cook County offered her was a genuine issue of fact is irrelevant because she did not attend the training offered.

¶ 30    Accordingly, to sustain a cause of action under section 20 of the Act, Dr. Lucas had to establish that she refused to participate in an activity which would result in the violation of either a state or federal law, rule or regulation; and that Cook County, her employer, retaliated against her because of her refusal to participate. *Sardiga*, 409 Ill. App. 3d at 61 (citing 740 ILCS 174/20 (West 2004)); 740 ILCS 174/20 (West 2010). Summary judgment is proper where a plaintiff fails to establish an element of a cause of action. *Pyne*, 129 Ill. 2d at 358. Here, Dr. Lucas failed to establish that either treating male patients or attending training to treat male patients violated a law, rule, or regulation. Accordingly, the circuit court properly entered summary judgment in Cook County's favor on the first count of Dr. Lucas's complaint.

¶ 31                    Count II: Common Law Retaliatory Discharge

¶ 32    Illinois follows the general rule that an at-will employee may be discharged " 'for any reason or no reason.' " *Turner v. Memorial Medical Center*, 233 Ill. 2d 494, 500 (2009) (quoting *Zimmerman v. Buchheit of Sparta, Inc.*, 164 Ill. 2d 29, 32 (1994)). Our supreme court, however, recognizes an exception to the general rule in an action for retaliatory discharge. *Hartlein v. Illinois Power Co.*, 151 Ill. 2d 142, 159 (1992). "To state a valid retaliatory discharge cause of action, an employee must allege that (1) the employer discharged the employee, (2) in retaliation for the employee's activities, and (3) that the discharge violates a clear mandate of public policy." *Turner*, 233 Ill. 2d at 500. Our supreme court has described the exception as "a limited and narrow cause of action." *Id.* If the employer has a valid, non-pretextual basis for discharging the employee, the element of causation is not met. *Hartlein*, 151 Ill. 2d at 160. An employee must identify a clear and specific mandate of public policy as opposed to a broad, general, or vague statement that does not provide specific guidance or is prone to multiple interpretations. *Turner*, 233 Ill. 2d at 503. "Unless the employee identifies a clear mandate of public policy that is violated by the employee's discharge, the complaint will not state a cause of action for retaliatory discharge." *Id.* Generally, the issue of retaliation is a question for the trier of fact to resolve. *Id.* at 501 n.1. The issue of whether a public policy exists, and the related issue of whether the employee's discharge undermines the stated public policy, is a question of law for the court to decide. *Id.* at 501.

¶ 33    In *Turner v. Memorial Medical Center*, our supreme court addressed a similar scenario to the case at bar. *Id.* at 496-99. In *Turner*, the plaintiff was a respiratory therapist at a community hospital. *Id.* at 497. The Joint Commission on Accreditation of Healthcare Organizations (Joint Commission) conducted a survey at the hospital to determine whether

---

[6]We express no opinion on whether a physician who refuses to treat a patient due to inadequate training would constitute a cause of action. We merely point out that in this case, Dr. Lucas repeatedly refused to attend any training to become qualified to treat male STD patients.

the hospital would receive accreditation. *Id.* Federal Medicare and Medicaid funding was dependent on the Joint Commission's accreditation. *Id.* The plaintiff, in a meeting with the Joint Commission and the vice president of patient care services at the hospital, informed the Joint Commission that there was a discrepancy between how the hospital charted a patient's file and the standard for charting set by the Joint Commission. *Id.* The hospital allowed its therapists to chart a patient's file at any point during the therapist's shift. *Id.* The Joint Commission, however, required a therapist to chart a patient's care immediately after care was given to the patient. *Id.* at 498. The plaintiff told the Joint Commission that the hospital's "deviation from the Joint Commission standard was jeopardizing patient safety." *Id.* The hospital thereafter terminated the plaintiff. *Id.* The plaintiff alleged the following public policies: a patient's right to " 'sound nursing and medical practices' " under the Medical Patient's Rights Act; that the hospital's charting policies were inconsistent " 'with sound medical practices,' " which " 'jeopardized the safety of patients,' " and that his termination " 'violated public policy that encourages employees to report actions that jeopardize patient health and safety.' " *Id.* Our supreme court held the plaintiff's complaint failed "to set forth a specific public policy, much less a *clearly mandated public policy*." (Emphasis in original.) *Id.* at 504. Our supreme court stated that "[b]ased on the narrow scope of a retaliatory discharge action, the general concept of 'patient safety,' by itself, is simply inadequate to justify finding an exception to the general rule of at-will employment." *Id.* at 507.

¶ 34    In this case, we hold that Dr. Lucas failed to set forth a clearly mandated public policy to support her claim of retaliatory discharge. Under count II of her amended complaint, like in count I of her amended complaint, Dr. Lucas alleged that she was terminated for reporting violations of title 68, section 1285.240, of the Administrative Code "and related rules or regulations *** to the Office of Professional Regulation." The public policy violated, according to Dr. Lucas, was that her "discharge for reporting medical practice, safety, and health violations to the Office of Professional Regulation is against clear mandated public policy which protects the health and safety of the citizens of Illinois." Similar to the plaintiff in *Turner*, Dr. Lucas in this case fails to set forth a clearly mandated public policy to support her claim. It is broad and general as opposed to clear and specific. See *Id.* at 502 ("A broad, general statement of policy is inadequate ***."). Like we stated in our discussion of count I of Dr. Lucas's amended complaint, title 68, section 1285.240, of the Administrative Code lists considerations that the Medical Disciplinary Board considers when disciplining physicians licensed under the Medical Practices Act of 1987. 68 Ill. Adm. Code 1285.240 (2005). We cannot say based on the length and amount of topics covered in title 68, section 1285.240, of the Administrative Code that Dr. Lucas properly articulated a clear mandate of public policy. Additionally, we cannot even say that the actions Dr. Lucas was terminated for, the refusal to treat male patients and the refusal to attend training to treat male patients, are even covered by title 68, section 1285.240, of the Administrative Code. Accordingly, Dr. Lucas failed to set forth a clear mandate of public policy to support her claim. The circuit court did not err when it granted Cook County's motion for summary judgment on count II of Dr. Lucas's amended complaint.

-13-

¶ 35                                    CONCLUSION

¶ 36          The judgment of the circuit court is affirmed.

¶ 37          Affirmed.